CASAZZA v DEPARTMENT OF COMMERCE

Docket No. 67396. Submitted November 4, 1983, at Lansing.—Decided April 30, 1984.

The Ann Arbor Co-Op Credit Union adopted a bylaw amendment which changed the requirements for membership in the credit union and changed its name to the Huron River Area Credit Union. Prior to submitting the proposed bylaw changes to the members for approval the credit union engaged in discussions with the Financial Institutions Bureau of the Michigan Department of Commerce. The bylaw amendment as finally proposed was the result of those discussions. The amendment was subsequently approved by the membership of the credit union. Anne Casazza, David Devanti, and others (hereinafter appellants), members of the credit union, objected to the change in bylaws and to the method by which the voting on the amendment was conducted. The Commissioner of the Financial Institutions Bureau issued an order disapproving appellants' request for a hearing and approving the amendment to the bylaws, finding specifically that the new field of membership was lawful and that the membership vote was valid. The appellants appealed the commissioner's order to the Washtenaw Circuit Court. That court, Ross W. Campbell, J., upheld the commissioner's findings. The circuit court's judgment was appealed. *Held:*

1. The statute governing the organization of credit unions requires that there be a common bond among the members. The commissioner, and the circuit court, concluded that the new membership requirements satisfied the statutory mandate of a common bond. The commissioner did not abuse her discretion or act contrary to law in resolving the ambiguities of the statute in the manner in which she did and in thereby holding that the statute was satisfied by the proposed membership requirements.

2. The new bylaws permit existing members to retain their membership. Such a practice is lawful and proper.

3. The proposed bylaw amendment was properly submitted to

REFERENCES FOR POINTS IN HEADNOTES

[1, 3, 4] 13 Am Jur 2d, Building and Loan Associations § 4.
[2] 2 Am Jur 2d, Administrative Law §§ 689, 691.
[5] 59 Am Jur 2d, Parliamentary Law §§ 4, 14.

the membership for a vote. A subsequent attempt by the credit union's board of directors to pass the amendment and make the membership vote advisory was not effective, and therefore did not affect the validity of the membership vote.

4. Voting was conducted over a five-day period at two different locations. The commissioner's finding that the manner of the vote followed "general parliamentary procedure", was not erroneous and will not be overturned in favor of the appellants' interpretation of the necessary requirements of a duly constituted meeting.

Affirmed.

1. BUILDING AND LOAN ASSOCIATIONS — CREDIT UNIONS — MEMBERSHIP OF CREDIT UNION.

Credit union organization is limited to groups having a common bond of occupation or association or to groups within a well-defined neighborhood, community, or rural district; additionally, a community credit union may be organized whose field of membership is composed of individuals who have a common bond based on relatively close geographical proximity to one another, personal acquaintance among the residents and the existence of community interests, activities and objectives (MCL 490.5; MSA 23.485).

2. ADMINISTRATIVE LAW — REVIEW — FINANCIAL INSTITUTIONS BUREAU.

Appellate review of a decision of the Financial Institutions Bureau is limited to a determination of whether the decision is authorized by law and, in cases where a hearing is required, is supported by competent, material and substantial evidence on the whole record (Const 1963, art 6, § 28; MCL 24.306[1]; MSA 3.560[206][1]).

3. BUILDING AND LOAN ASSOCIATIONS — CREDIT UNIONS — MEMBERSHIP OF CREDIT UNION — COMMON BOND.

A credit union's bylaw which limits membership to employees of employers located in a two-county area with no more than 400 employees, which employers agree to provide the credit union with payroll deductions, and excepting persons eligible for primary membership in another occupational credit union satisfies the common bond requirement of the statute controlling credit union organization (MCL 490.5; MSA 23.485).

4. BUILDING AND LOAN ASSOCIATIONS — CREDIT UNIONS — MEMBERSHIP OF CREDIT UNION.

A credit union does not act unlawfully when it retains existing members after changing its field of membership.

5. PARLIAMENTARY LAW — MEETINGS — ADJOURNED MEETINGS.

A deliberative body acts only at a meeting, regular or special, held pursuant to law; an adjourned meeting is legally the continuation of the meeting of which it is an adjournment, and at such a meeting anything may be done which might have been done if no adjournment had taken place.

*Susan E. Morrison,* and *Stanley M. Pollack* and *Paul F. Teich,* for appellants.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Harry G. Iwasko, Jr.,* Assistant Attorney General, for the Department of Commerce, Financial Institutions Bureau.

*Raymond F. Clevenger,* for intervening appellee, Huron River Area Credit Union.

Amicus Curiae:

Michigan Credit Union League (by *Lawrence W. Radak).*

Before: CYNAR, P.J., and BEASLEY and T. GILLESPIE,* JJ.

BEASLEY, J. Appellants, who are members of the Huron River Area Credit Union, formerly known as Ann Arbor Co-Op Credit Union, appeal from an order of the Washtenaw County Circuit Court affirming a decision of the Commissioner of the Michigan Financial Institutions Bureau granting a bylaw amendment to the Ann Arbor Co-Op Credit Union.

This appeal is brought pursuant to the Michigan Constitution of 1963, art 6, § 28, as implemented by the Michigan Administrative Procedures Act.[1] While various issues are raised on appeal which will be dealt with in detail, the primary issue in

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] MCL 24.306(1); MSA 3.560(206)(1).

this case involves interpretation of the common bond provision of the credit union statute, which provides in part as follows:

"Credit union membership shall consist of the incorporators and other persons as may be elected to membership and subscribe to at least 1 share, pay the initial installment on the share, and pay any entrance fee required by the bylaws. Deposits may be accepted and maintained pursuant to section 4(x) without the depositor subscribing to or paying for a share in the credit union. Organizations, incorporated or otherwise, composed for the most part of the same general group as the credit union membership may be members. *Credit union organization shall be limited to groups, of both large and small membership, having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district and 1 or more credit unions may be organized to serve those groups.* A community credit union may be organized whose field of membership is composed of individuals who have a common bond based on relatively close geographical proximity to one another, personal acquaintance among the residents, and the existence of a community of interests, activities, and objectives." (Emphasis added.)[2]

The Ann Arbor Co-Op Credit Union, now known as the Huron River Area Credit Union, was organized as a Michgan credit union corporation in 1937 by seven persons, all of whom were members of the Ann Arbor Co-Operative Society, Inc., which had been incorporated in 1936.[3] Initially, membership in the credit union was limited to persons

[2] MCL 490.5; MSA 23.485. The common bond provision is contained in § 5 of the statute, which was last amended by 1979 PA 90, § 1, effective August 1, 1979.

[3] Membership in the Ann Arbor Co-Operative Society, Inc., required only payment of the membership fee. There was no common bond requirement, unless we consider that membership in the Ann Arbor Co-Operative Society, Inc., was an associational common bond.

who were members of the cooperative society. Prior to the bylaw amendment, which is part of the subject matter of this appeal, article III, § 1 of the credit union's bylaws provided:

"Membership in this credit union shall be limited to persons who are members of the Ann Arbor Cooperative Society, Inc.; employees of this credit union; members of their immediate families; also organizations, incorporated or otherwise, composed for the most part of the same general group making up the membership outlined above. A spouse of a deceased member may be elected to membership at any time prior to remarriage. A subscribing member shall not be eligible to vote, or hold office, until one fully paid share is owned."

The proposed amendment to the bylaw, which was subsequently approved by the Financial Institutions Bureau (FIB), provides as follows:

"Membership in this credit union shall be limited to

"A. Individuals who are employed by organizations whose total employment is 400 or less and have agreed to provide this credit union with payroll deduction and are located in Livingston or Washtenaw Counties, except those persons eligible for primary membership in another occupational credit union;

"B. Members of Ann Arbor Co-Op Credit Union on the date of approval of this amendment;

"C. Individuals employed by an organization providing payroll deduction exclusive of 'net pay' to Ann Arbor Co-op Credit Union on the date of approval of this amendment;

"D. Members of the immediate family of the foregoing; employees of the credit union;

"also organizations, incorporated or otherwise, composed for the most part of the same general group making up the membership outlined above. A spouse of a deceased member may be elected to membership at any time prior to remarriage. A subscribing member

shall not be eligible to vote, or hold office, until one fully paid share is owned."

The credit union intervened in the circuit court proceeding, filing a brief which describes the factual setting for this appeal. After describing the organization and incorporation of the Ann Arbor Co-Operative Society, the brief correctly notes that, in 1980, the FIB approved the merger of Livingston Community Federal Credit Union into the within credit union, without requiring those members to join the society.

By definition, very few persons could join the credit union without first joining the society. To join the society, a person had to pay a one-time membership fee, which, for many years, was $10. On December 16, 1980, the society's board of directors increased the fee to $15 and refused to reconsider when the credit union requested it. The starting effective date of the increase was apparently in February, 1981. The credit union claims that in the highly competitive market which existed by that time, the membership fee, and particularly the increase, had become a serious handicap to the credit union in attracting new members and depositors.

In December, 1980, the credit union began discussions with the FIB regarding possible changes in its field of membership. Eventually, the FIB advised the credit union that it would approve a bylaw amendment creating the field of membership eventually selected by the credit union. On July 24, 1981, the FIB issued a staff recommendaton for an order approving the amendment to the bylaws and the certificate of organization. In their recommendation, the staff dealt with interpretation of the statutory provisions concerning common bond, noting that two arguments in particu-

lar were made against the proposed common bond: (1) that employee groups of under 400 employees do not share a common bond under the law and (2) that a hybrid membership of current credit union members and a future industrial base share no common bond under the law. The staff responded by indicating that there are approximately 11 state chartered credit unions with a field of membership similar to the one proposed in the bylaw amendment. The staff recommendation says the purpose of this type of charter is to enable the credit union to service employer groups that are too small to support their own credit union and are willing to provide payroll deduction. The recommendation also says that the bureau has on file approximately 15 state chartered credit unions whose common bond is membership in a co-operative association, and that there are no restrictions on who may join the association.

In his brief, the Attorney General says the commissioner was faced with a Hobson's choice, indicating that the commissioner did not view her decision as a simple one. He argues that the crux of the case involved change in the credit union's name and field of membership.

On September 9, 1981, the commissioner issued an "order to disapprove request for hearing and to approve amendment to bylaws and certificate of organization". In approving this request to amend article III, § 1 of its bylaws, the commissioner responded to the various issues raised by the appellants, finding specifically with respect to common bond as follows:

"The commissioner finds that the proposed field of membership is permissible. This field of membership allows credit union membership to employees of smaller businesses which may otherwise not be able to economi-

cally provide credit union services to their employees. Section 5 of the credit union act is satisfied in that the credit union will now be organized to serve easily identifiable groups within a well-defined neighborhood. As indicated above, the commissioner has determined that the membership vote to provide this form of organization was valid."

When appellants appealed to the circuit court from the commissioner's order, the circuit judge approved the commissioner's findings, holding that he was satisfied that the proposed field of membership did not lack a common bond. We are satisfied that the credit union statute does not prohibit a credit union from changing its field of membership.

In deciding whether to approve such changes, the FIB considers whether the change is consistent with the wishes of the credit union membership, whether the credit union will remain in a safe and viable financial condition, and whether the remaining field is legally permissible.

In interpreting the statute, at the outset we recognize that we face a somewhat anomalous situation. This credit union corporation, which was organized 40 to 50 years ago by a co-operative corporation, appears to have far outgrown its parent. This is not the only credit union whose existence began and continues to rest upon a co-operative corporation. To some extent, it would appear that some of the co-operative corporations so situated only continue to exist as the basis for continuation of their off-spring credit union corporations. It is unfortunate that the judiciary is confronted by this situation, when the answers appear to rest with the Legislature. In short, we urge the Legislature to address its attention to this problem and to enact whatever legislation may be wise and desira-

ble to eliminate ambiguity and to assure the existence of large and viable credit union corporations without leaving them dependent upon co-operative corporations whose current connections with the credit unions are in many instances tenuous at best.

The credit union statute, and the common bond provision in particular, were the product of an earlier time and different circumstances. The regulatory agency, which in this state is now called the Financial Institutions Bureau, has had no choice but to attempt, under statutes which have in some respects become outmoded (and were always confusing), to regulate credit unions which have grown large and strong. We note that in Michigan, in contrast to North Carolina,[4] neither the banking nor the savings and loan institutions have attempted to intervene and to defeat the efforts of this credit union to expand its field of potential membership.

While we would welcome more and better legislative guidance in the form of updating of the credit union statute, we are not inclined to interpret the statute before us as requiring us to cripple and limit the operations of strong and viable credit union corporations. We do not interpret the current credit union statute as being designed to curtail possible competition by the credit unions with the banking and savings and loan institutions. We view the intent of the Michigan credit union statute to be to encourage growth of credit unions and increases in membership. Against that background, we now address ourselves to the specific language of the statute.

The statute provides that the credit union orga-

---

[4] See *North Carolina Bankers Ass'n v North Carolina Credit Union Comm*, 302 NC 458; 276 SE2d 404 (1981).

nization shall be limited to groups, which groups may be of both large and small membership. The groups must have a common bond of occupation or association, or be groups within a well-defined neighborhood, community, or rural district. One or more credit unions may be organized to serve these groups. The key word in this discussion is *group,* whose commonly accepted definition is a number of persons gathered closely together and forming a recognizable unit.[5] However, the statute also provides that a community credit union may be organized whose field of membership is composed of individuals who have a common bond based on relatively close geographical proximity to one another, personal acquaintance among the residents and the existence of community interests, activities, and objectives.[6] The FIB determined that the field of membership provided by the amendment had a common bond, as that term is used in the statute.

On appeal, the Michigan Constitution affords judicial review to determine whether the decision of the FIB was authorized by law and, in cases where a hearing is required, whether the decision is supported by competent, material, and substantial evidence on the whole record.[7] Appellants' attack here is primarily as to the legality of the determination and, specifically, whether the FIB decision rests upon an incorrect interpretation of

[5] *Webster's New Collegiate Dictionary* (G & C Merriam Co).

[6] The punctuation of the statute leaves something to be desired. Attempts to diagram the sentence which reads: "[C]redit union organization shall be limited to groups, of both large and small membership, having a common bond of occupaton or association, or to groups within a well-defined neighborhood, community, or rural district and one or more credit unions may be organized to serve those groups," reveal an ambiguity.

[7] Const 1963, art 6, § 28.

the common bond requirement of the statute. We would agree that the language of the statute is to a degree ambiguous. However, we do not agree that the ambiguity redounds to the benefit of appellants. On the contrary, we believe that the FIB was entitled to resolve the ambiguities of the statute in the manner which it did, namely, to adopt what appellants appear to consider a loose definition of the term.

In this case, we hold that the first limitation on membership, as provided in subsection A of the amended bylaw, is permissible under the statute. Subsection A of the amended bylaw defines groups of individuals with a common bond of occupation or association, namely, (1) employees of organizations (employers) located in Livingston or Washtenaw Counties, with no more than 400 employees, (2) which organizations (employers) agree to provide the credit union with payroll deductions, and (3) *excepting* persons eligible for primary membership in another occupational credit union.

The conclusions reached by the FIB are not unlike the federal regulations under 12 USC 1751 *et seq.*, which regulations authorize an occupational common bond for a credit union based on employment by different employer units in a specified geographical area. The feature which provides commonality in the employment relationship, as distinguished from one based solely on association, is the employment relationship itself.

We agree that in establishing permissible fields of membership, economic viability must be considered. This simply means that while 50 or 60 years ago a very small group may have been capable of supporting a successful credit union, under today's economic circumstances that is no longer possible, but a collection of several small groups could

provide enough members to make a viable credit union.

Appellants attack the proposition that employees of organizations with total numbers of employees of 400 or less and who agree to provide payroll deductions possess an occupational common bond. Appellants do admit that employees of one company possess a common bond with each other. We agree that employees of a single employer, *e.g.,* a major automobile company, have an occupational common bond in the context of working for a single employer having multiple occupational similarities and enjoying shared occupational interests, activities, and objectives. From that proposition, we analogize that size of a company (not more than 400 employees) is one factor that may support a conclusion that a common bond exists. Another is willingness of an employer to provide payroll deductions. Thus, we do not accept appellants' premise that there is insufficient common bond here to satisfy the statute.

Appellants place considerable emphasis upon *North Carolina Bankers Ass'n v North Carolina Credit Union Comm.*[8] In that case, the North Carolina Supreme Court emphasized what it deemed to be unfair competition between credit unions on the one hand and banks and savings and loan associations on the other. As previously indicated, we are not confronted by any such issue. We believe that issues of competition among financial institutions are essentially legislative. The North Carolina Supreme Court rested decision upon its conclusion that application of the correct interpretation of the common bond requirement of the North Carolina statute indicated an error of

---

[8] See fn 4 *supra.*

law in permitting expansion of the field of membership provision.

While recognizing some similarities in the statutes of Michigan and North Carolina, we are neither bound by nor persuaded by the restrictive interpretation the North Carolina court put on the common bond provision. We decline to adopt a strict, limiting interpretation of the statute that would outlaw the FIB approval and require reversal.

Thus, we hold that these employees, working for employers of 400 or less, located in Livingston or Washtenaw Counties and providing the credit union with payroll deductions, are within the statutory definition of a common bond of occupation or association in a specified geographic area. Thus, strictly speaking, it is unnecessary to decide whether these employees come within either the comon bond afforded by groups within a well-defined community or the so-called community credit union provided for in the last sentence of § 5 of the statute. In so holding, we recognize that the statute is awkwardly worded and some of its terminology vague and uncertain, but we decline to second-guess the FIB in its effort to construe the statute reasonably. We agree with the Michigan Credit Union League, a Michigan nonprofit membership corporation, which was permitted to file an amicus brief, that a decision upsetting the FIB order could have wide-ranging adverse consequences on credit unions and their capacity to serve their members.

While we do not believe that a common bond is required once a credit union has been validly organized, we are in accord with the FIB policy of requiring, to the extent practicable, a continuing common bond of some sort after organization.

In the within case, the groups are similar in occupation or association, *i.e.,* each group of employees is employed by an employer located in Livingston or Washtenaw County, which employs 400 or less employees and furnishes the credit union with payroll deductions. Since we believe the statute permits a single credit union to have a field of membership consisting of employees of more than one group as long as the composition of each group is based on a single criterion, we find the FIB approval to be in accordance with the statute. There is precedent in Michigan for permitting credit unions whose fields of membership consist of more than one associational group, such as the Suburban Catholic Credit Union and the Lansing Building Trades Council Credit Union.

Three additional issues require discussion. First, appellants strongly object to the implications of the "once a member, always a member" tradition of credit union membership. They contend that such a practice creates a hybrid field of membership; in this case, appending the new occupational bond group to the old associational group, creating a credit union with no common bond between all its members. Appellee-intervenor and amicus curiae contend that the Michigan statute requires only that a common bond exist when a credit union is organized and that the Michigan statute, unlike the federal one, does not require that the bond be maintained by the membership after organization of the credit union.[9]

We agree with the view that a credit union does not violate the statute when it retains existing members after changing its field of membership. Requiring a credit union to expel members not falling within the new field of membership would

[9] 12 USC 1759.

destroy the current basis for its existence during the change period and greatly inhibit the potential for growth and inherent stability of a credit union.

In the instant case, the FIB has approved a provision in the new bylaws permitting existing members to retain their membership. We believe this to be lawful and proper. The policy reasons behind such a practice are sound. To continually police each credit union member's current status would, as the Attorney General puts it, create a "regulatory nightmare".

The next issue concerns the voting procedures used to pass the bylaw amendment. MCL 490.2; MSA 23.482 provides:

"Upon approval by a majority of the members present at a duly constituted annual or special meeting of the members, the membership may amend the certificate of organization and bylaws or delegate or rescind the authority to amend the bylaws to the board of directors. Any proposed action to amend the certificate of organization of bylaws or delegate authority to amend the bylaws shall be stated in a notice of call of the meeting. An amendment to the articles of organization or bylaws shall be approved by the commissioner before becoming operative."

Appellants argue that the amendments were not adopted at a duly constituted meeting and, thus, the membership lacked legal capacity to adopt them.

On March 25, 1981, the credit union board of directors resolved to call a special meeting for the membership to vote on the proposed bylaw amendments. Notice of the special meeting set for April 15, 1981, was mailed to the membership on April 3, 1981. The notice set forth the existing bylaw provisions and the proposed amendments.

Apparently, due to concern that the FIB would not acept the results of the five-day balloting procedure planned for the April 15 meeting, the board of the credit union met April 4, 1981, and passed the bylaw amendments by an 8 to 1 vote. They also made the membership vote advisory. However, the FIB apparently then advised the credit union that it would not approve the amendments if adopted by the board. The notice of the April 15 meeting was not rescinded by the board, nor was the membership notified by the board of the board's April 4, 1981, actions.[10]

On April 15, 1981, the special meeting was held at the credit union's main office. The chairman of the meeting apparently made it clear that the vote would be a binding one, not merely advisory. The meeting was then adjourned and the polls were opened for voting during business hours at the two credit union locations for the next five business days. A majority of the votes cast were in favor of the name change and bylaw amendments.

Appellants argue that the actions of the board on April 4, 1981, voided the notice mailed April 3, 1981, and so, at the April 15, 1981, meeting, the membership lacked the legal capacity to amend the bylaws. Appellants further contend that the vote was not conducted at a duly constituted meeting as required by the statue. Article XVII, § 1 of the bylaws reads:

"These bylaws may be amended by those members present and entitled to vote at the annual or special meeting of the membership or by the unanimous vote of at least a quorum of the board of directors."

---

[10] Some members of the credit union, however, apparently did learn of the April 4, 1981, board meeting, as the Ann Arbor Co-Op Society sent a letter to the FIB on April 7, 1981, protesting the board's actions.

The commissioner approved the bylaw amendments, finding that the form of notice was proper and that "there is no evidence to indicate that the action taken by the board of directors on April 4 to make the membership vote advisory only had any impact on the final results of the membership vote held pursuant to the April 15, 1981 membership meeting". As the April 3 notice was never rescinded, the April 15 meeting was held with proper notice.

Appellants refer to a parliamentary definition of the word "meeting", citing Roberts Rules of Order (1970 ed, p 70):

"A single official gathering of its members in one room or area to transact business for a length of time during which there is no cessation of proceedings and the members do not separate unless for a short recess as defined below."

They argue that a five-day vote by the credit union membership, conducted at two different locations, did not constitute a 'meeting' as required by the statute for bylaw amendment.

67A CJS, Parliamentary Law, § 5, p 616, gives a far less restrictive description of the word, stating:

"A deliberative body acts only at a meeting, regular or special, held pursuant to law. An adjourned meeting is legally the continuation of the meeting of which it is an adjournment, and at such a meeting anything may be done which might have been done if no adjournment had taken place."

The credit union act does not define the word "meeting". Over the years, the FIB has apparently authorized various balloting procedures ranging from mail ballots for the election of directors to

procedures such as that employed in the instant case.

An analogy can be made to corporate stockholders' meetings where the general trend is to permit corporations to conduct affairs without requiring the physical presence of members at a single time and place. Appellees argue that the extended balloting procedure is akin to an adjourned meeting, with the polls kept open for voting purposes and following the adjournment.[11] The apparent purpose of the five-day procedure was to permit greater membership participation. The commissioner found that "general parliamentary procedure" was followed in the proceedings and did not find error in the voting procedures. We will not overturn her finding in favor of reading appellants' restrictive definition of the word "meeting" into the statute.

Appellants object that no evidentiary hearing was held prior to making this determination, noting that approximately 400 complaints were filed with the FIB complaining that the vote was conducted in a confusing manner. They also seek to have the election set aside because of the allegedly improper actions of credit union employees at the polling place during the course of the five-day vote. Appellants contend that misrepresentations or omissions were made regarding the subject matter of the election and that some employees unduly

---

[11] 67A CJS, Parliamentary Law, § 5, p 617, states:

"An adjourned meeting is legally the continuation of the meeting of which it is an adjournment. At such adjourned meeting the governing body can do any act which might have been done if no adjournment had taken place, and, conversely, the limitations imposed on the governing body as regards action at the original meeting obtain at the adjourned meeting, whether it is regular or special. Where a regular meeting is adjourned, any business which would have been proper to consider at that meeting may be considered and acted on at the adjourned meeting, and business proposed, but not included, at a regular meeting may be legally considered and determined by a deliberative body at an adjourned meeting." (Footnotes omitted.)

influenced the vote of the members by aggressive campaigning in support of the proposed amendment.

The commissioner validated the election procedure, finding "no evidence of fraud or deceit with regard to the campaigning by credit union employees". As the circuit court concluded:

"[T]he record shows that the meeting was duly constituted within the meaning of § 2 of the credit union act and adequately complied with the applicable law. Further, the procedures followed were neither unlawful nor did they result in material prejudice to the society. The court is of the opinion that the commissioner did not abuse her discretion nor were her findings contrary to law or the great weight of the evidence."

While declining to overturn the election, we do take notice of the importance of purity in the election process. It seems obvious that the persons conducting the election and counting the votes have no business "electioneering" at the voting place.

The commissioner found that "the election was held in conformance with 'general parliamentary procedure', the election was not in contravention of the credit union act or the bylaws of the Ann Arbor Co-Op Credit Union, proper notice of the voting procedures was contained in the notice of the membership meeting and a greater member participation in the decision of this issue was engendered by these procedures".

Further, as noted in the FIB staff recommendation for an order approving the amendment to the bylaws and certificate of organization, while the Michigan credit union act makes no provision for oral argument in such matters, the credit union's request for oral argument was granted in the

interest of fairness. However, as a condition of the granting of oral argument, the bureau required a copy of each complaint to be sent to the board of directors of the credit union, and that an affidavit be filed by June 17, 1981, with the bureau stating that the condition was met. No affidavit was filed.

Our review of the record causes us to support the commissioner's findings with regard to the voting procedures.

In conclusion, this appeal is, as noted, brought pursuant to Const 1963, art 6, § 28, which provides in pertinent part:

"All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record."

As noted previously, the decision to approve the bylaw amendment is not a case in which a hearing was required by the act. Review of the commissioner's ruling does not indicate any abuse of discretion.[12] Also, as previously noted, the statute provides for considerable exercise of discretion by the commissioner:

"The commissioner shall promulgate rules in addition to those specifically provided for by this act as he may deem necessary to effectuate the purposes and to execute and enforce the provisions of this act in accordance

---

[12] *Bannan v City of Saginaw,* 120 Mich App 307, 324; 328 NW2d 35 (1982), *lv gtd* 418 Mich 880 (1983).

with and subject to Act No. 306 of the Public Acts of 1969, as amended, being sections 24.201 to 24.315 of the Michigan Compiled Laws."[13]

Consequently, we do not find any abuse of discretion or arbitrary action on the part of the commissioner.

Affirmed.

[13] MCL 490.27; MSA 23.506(27).