151 Mich. App. 452 (1986)
391 N.W.2d 371
PSB STATE BANK
v.
COMERICA INCORPORATED
Docket No. 79204.
Michigan Court of Appeals.
Decided May 6, 1986.
Frank J. Kelley, Attorney General, Louis J. Caruso, Solicitor General, and Harry G. Iwasko, Jr., and Philip J. Smith, Assistants Attorney General, for the Commissioner of the Financial Institutions Bureau.
*455 Miller, Canfield, Paddock & Stone (by Carl H. vonEnde and Thomas G. Appleman), for Comerica Incorporated.
Donavan, Hammond, Ziegelman, Roach & Sotiroff, P.C. (by Thomas A. Roach and Thomas E. Reiss), for Pontiac State Bank.
Dickinson, Wright, Moon, VanDusen & Freeman (by Patrick J. Ledwidge, H.G. Sparrow, III, and John K. Lawrence), for PSB State Bank and NBD Bancorp, Inc.
Before: D.E. HOLBROOK, JR., P.J., and ALLEN and E.M. THOMAS,[*] JJ.
PER CURIAM.
On December 8, 1983, the Commissioner of the Financial Institutions Bureau approved a proposed consolidation of applicant PSB State Bank and applicant Pontiac State Bank, pursuant to §§ 125 and 130 of the Michigan Banking Code of 1969, MCL 487.425 and 487.430; MSA 23.710(125) and 23.710(130), over the protest of Comerica Incorporated. The commissioner's approval was affirmed by the circuit court.
Applicant Pontiac State Bank is a Michigan banking corporation which operates its business principally in Oakland County. Comerica is a shareholder of Pontiac, and controlled approximately twenty-one percent of Pontiac's shares as of July, 1983. Applicant PSB State Bank is a nonoperating "phantom bank." It is a wholly owned subsidiary of NBD Bancorp, Inc., which was formed solely to effectuate a triangular consolidation involving NBD, Pontiac, and PSB pursuant to §§ 125 and 130. NBD is a Delaware corporation registered as a bank holding company under the Bank Holding *456 Company Act of 1956, as amended, 12 USC 1841 et seq.
A triangular consolidation such as the one used in the present case enables a bank holding company (such as NBD) to acquire one hundred percent ownership of an existing bank (such as Pontiac). In a triangular consolidation, a bank holding company creates a wholly-owned subsidiary known as a "phantom" or "interim" bank. This bank is a corporate shell which is not empowered to engage in the business of banking, although it is chartered and is subject to its own corporate bylaws. An agreement of consolidation is entered into between the holding company, the phantom bank, and the existing bank sought to be acquired. After the appropriate approvals, the phantom bank and the existing bank undergo a corporate merger. The result is an operational "surviving bank" which is a wholly-owned subsidiary of the holding company. Use of this procedure is statutorily authorized by subsection 130(2)(a) of the banking code, which provides:
(a) Natural persons as provided in section 52 may organize and incorporate as the incorporator or incorporators a new bank having its principal office in the same city or village as the principal office of an existing bank in the manner specified in section 53, but without regard to the provisions of subdivisions (b), (c) and (e) of subsection (3) of section 53 and section 55, if the new bank is organized for the sole purpose of effecting its consolidation under section 125 with an existing bank having its principal office in the same city or village as such new bank and if upon completion of the consolidation a bank holding company becomes the owner of all of the outstanding voting shares of the consolidated organization, other than shares necessary to qualify directors. The new bank and the existing bank may consolidate under *457 the charter of either bank and the provisions of sections 125, 126, 127 and 128 shall be applicable with respect to the consolidation except that the agreement of consolidation may provide that shares of either or both the consolidating organization, in lieu of being converted into shares of the consolidated organization, will be converted into shares or other securities of the bank holding company. [MCL 487.430; MSA 23.710(130). Emphasis added.]
Section 125, incorporated into § 130 by reference, authorizes consolidations of two or more existing and operating banks without the involvement of a bank holding company. It provides in pertinent part:
The directors, or a majority of them, of each organization proposing to consolidate, may enter into an agreement signed by them and under the seals of the respective organizations, prescribing the terms and conditions of consolidation, the mode of carrying the same into effect and stating such other facts required or permitted by the provisions of this act and the national banking laws to be set out in articles, as can be be stated in the case of a consolidation, to be stated in such altered form as the circumstances of the case require, as well as the manner of converting the shares of each of the consolidating organizations, into shares of the consolidated organization, with such other details and provisions as are deemed necessary. [MCL 487.425; MSA 23.710(125).]
Pursuant to these statutory provisions, NBD and PSB entered into a consolidation agreement with Pontiac. This agreement provided for the consolidation of Pontiac and PSB with the intent to create a surviving bank which would operate under the charter and bylaws of PSB and under the Pontiac State Bank name.
*458 Under the terms of the consolidation agreement, each share of PSB stock was to be converted into shares of stock of the surviving bank (the numbers of shares to be determined by formula) upon the consummation of the consolidation. NBD would own all outstanding stock of the surviving bank. Shares of Pontiac were to be converted into shares of NBD stock using a specified formula. The agreement further provided that Pontiac shareholders would receive $27.50 cash per share of Pontiac instead of NBD stock in three situations: (1) where the shareholder would otherwise receive a fractional share of NBD stock, (2) where the aggregate value of the NBD stock to be received was less than $1,000, and (3) central to the present case, where the shareholder elected to receive cash in lieu of NBD stock. Finally, the agreement provided that no more than fifty percent of the total value of Pontiac's common stock could be paid for in cash.
Comerica had also been interested in acquiring Pontiac. In April, 1983, it submitted its own proposal for consolidation, which provided for payment to shareholders entirely in cash, to Pontiac's directors, who subsequently rejected it.
Under subsection 125(4) of the Banking Code, shareholders representing two-thirds of the total number of Pontiac shares had to vote to adopt the NBD-PSB-Pontiac consolidation agreement before the consolidation could be submitted to the commissioner for approval. A proxy battle between NBD and Comerica ensued, and in a vote conducted at a meeting of Pontiac shareholders on July 14, 1983, the NBD-PSB-Pontiac consolidation agreement was adopted by shareholders holding approximately seventy-one percent of Pontiac's shares. Predictably, Comerica voted its shares against the proposed consolidation.
On August 19, 1983, NBD and PSB submitted an *459 application for approval of the PSB-Pontiac consolidation to the commissioner. Comerica filed a statement of protest and request for oral argument. The basis of the protest was Comerica's contention that § 130 precluded payment of cash to Pontiac shareholders upon its acquisition by NBD, as provided in the consolidation agreement.
The issue before the commissioner was whether §§ 125 and 130 allow payment of cash to shareholders of an existing bank upon its acquisition by a bank holding company. The commissioner held that cash payment was authorized, concluding, inter alia, that while the Banking Code does not specifically provide that shares of either of the consolidating banks may be converted to cash in lieu of being converted into shares of the surviving bank in a § 130 consolidation, the Legislature did not intend that only shares or other securities of the bank holding company may serve as consideration in a § 130 consolidation. Accordingly, the PSB-Pontiac consolidation was approved. The circuit court affirmed, holding that cash consolidations were permitted under the Banking Code.
Const 1963, art 6, § 28 affords judicial review to determine whether a decision of the Financial Institutions Bureau is authorized by law and, in cases where a hearing is required, whether a decision is supported by competent, material, and substantial evidence on the whole record. Casazza v Dep't of Commerce, 134 Mich App 249, 258; 350 NW2d 855 (1984). The interpretation or construction of a statute is a question of law. Thus, the question on appeal is whether the commissioner committed an error of law in holding that §§ 125 and 130 allow cash as consideration in a § 130 merger. We find that he did not.
On its face, § 130 neither allows nor disallows cash payment in exchange for shares of consolidating *460 banks. We agree with the commissioner and the circuit court that this creates an ambiguity and makes statutory construction appropriate. As the circuit court noted: "The ambiguity may be stated as follows: If a form of consideration for shares is not expressly allowed, is it prohibited? Or, conversely, if a form of consideration for shares is not prohibited, is it allowed?"
The primary goal of statutory construction is to determine the intent of the Legislature. Grand Rapids v Crocker, 219 Mich 178, 182-183; 189 NW 221 (1922). It is appropriate to consider the general purpose sought to be accomplished by a statute in determining its meaning. General Motors Corp v Erves (On Rehearing), 399 Mich 241, 254-255; 249 NW2d 41 (1976). Additionally, an administrative agency's interpretation of a statute is given considerable weight due to the expertise of the agency with respect to the subject under its jurisdiction. Magreta v Ambassador Steel Co (On Rehearing), 380 Mich 513, 519; 158 NW2d 473 (1968).
Here, the commissioner found that the literal reading of the statute which Comerica urged would produce results not intended by the Legislature, since conformity with permitted methods of merger or consolidation under federal banking law, which does permit consolidations for cash, was the purpose behind the enactment of § 130 in 1972. 1972 PA 128. The commissioner relied on the statement of Robert P. Briggs, who was commissioner when § 130 was added to the banking code, that "competitive equality of state banks versus national banks" was needed and that "if state banks are not afforded equal opportunities for forming a bank holding company, the competitive equality of state banks will continue to be adversely affected." (Briggs's statement was made before the House Private Corporations Committee *461 regarding House Bill 5845 on February 8, 1972.) The commissioner also noted that approximately thirty cash bank consolidations had been approved since 1979 and pointed out that those consolidations occurred at the same time as did numerous legislative enactments amending the banking code. The commissioner concluded that "the Legislature, presumably aware of the bureau's interpretation of, and action on, §§ 125 and 130 consolidations, did not act to prohibit or restrict that interpretation [allowing cash] even though ample opportunity to do so was demonstrated."
Contrary to Comerica's argument, we believe that the commissioner properly applied the doctrine of legislative acquiescence in determining that cash transactions were contemplated under § 130 of the banking code. While legislative acquiescence standing alone is not controlling, it may be assumed that the Legislature was aware of the prior interpretation of the act and silence of the Legislature can be construed as consent to the accuracy of that interpretation. Magreta, supra, pp 519-520. In the present case, it seems apparent that if the Legislature had not contemplated cash consolidations it could have amended the statute to modify that established practice.
The commissioner's determination  that the purpose behind the enactment of § 130 was to make state banking practices with respect to mergers and consolidations more equivalent to federal banking practices  is supported by subsection 130(2)(c), which broadly provides that the consolidation or merger of banks or of national banking associations is permitted in any manner provided, not only by the Legislature in the banking code but also "by the national banking laws." In the present case, it is clear that if cash consideration in bank consolidation matters is not permitted *462 the validity of approximately ten percent of the existing state banks in Michigan today would be open to question. If §§ 125 and 130 are narrowly construed to forbid cash consideration to shareholders, bank holding companies could easily organize their phantom banks as national banks and, thus, under the federal statute, offer cash consideration. There is in Michigan, and in the United States, a strong public policy in support of a dual banking system of state and national banks. The result of a strict reading of § 130 would be to contravene this public policy.
We cannot perceive any policy basis for prohibiting cash payments for shares. The commissioner's overall financial regulatory authority and specific authority to approve bank mergers and consolidations provide an adequate safeguard against disadvantageous cash transactions. Whether the merger or consolidation occurs under § 125 or § 130 of the banking code, the provisions of § 125 with respect to the commissioner's approval of consolidations are applicable. Such approval must be based upon an examination of each of the banks involved in the consolidation and of the agreement of consolidation. With the power of the commissioner to assure that the creditors, which include depositors and the public, are not injured by the consolidation, there is no policy reason to narrowly construe the provisions of §§ 125 and 130 so as to prohibit cash consideration.
Affirmed.
NOTES
[*] Recorder's court judge, sitting on the Court of Appeals by assignment.